IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PATSY McCLEAN, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-1220-N-BK |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order 3*, this case has been referred to the undersigned for Findings, Conclusions, and Recommendation. The cause is now before the Court on Plaintiff's *Motion for Summary Judgment* (Doc. 19) and Defendant's *Motion for Summary Judgment* (Doc. 20). For the reasons set forth herein, it is recommended that Defendant's *Motion for Summary Judgment* be GRANTED, Plaintiff's *Motion for Summary Judgment* be DENIED, and the Commissioner's decision be AFFIRMED.

## I. BACKGROUND[1]

**A.     Procedural History**

Patsy McClean seeks judicial review of a final decision by the Commissioner of Social Security denying her claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Title II and XVI of the Social Security Act (Act). On April 19, 2002, Plaintiff applied for DIB and SSI, claiming that she had been disabled since June 26, 1995, due

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

1

to seizures, an inability to walk, chronic obstructive pulmonary disease (COPD), limited use of her arms, a broken neck, bipolar disorder, manic depression, and pain. (Tr. at 119-120, 140). Her application was denied initially and on reconsideration, and Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 50-51, 56). On March 26, 2004, the ALJ issued his decision finding Plaintiff disabled as of November 29, 2001, which Plaintiff timely appealed to the Appeals Council. (Tr. at 56-61). The Appeals Council granted Plaintiff's request for review, and on April 13, 2005, remanded the case for further administrative proceedings and a new hearing. (Tr. at 62-65). Following another administrative hearing, the ALJ issued a decision on August 14, 2006, once again finding Plaintiff disabled as of November 29, 2001. (Tr. at 69-75). The Appeals Council again granted Plaintiff's request for review, and on September 3, 2007, issued a decision and order vacating the previous decision, finding that Plaintiff was disabled beginning August 24, 2005, and remanding the case to a new ALJ for further administrative proceedings and determination of whether Plaintiff was disabled before August 24, 2005. (Tr. at 78-85).

The new ALJ held a hearing on March 11, 2009. (Tr. at 1211). On April 3, 2009, the ALJ issued a decision finding Plaintiff was not disabled within the meaning of the Act for the time period of June 26, 1995 though August 23, 2005. (Tr. at 20-36). Subsequently, the Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. (Tr. at 8-10). Plaintiff timely appealed the Commissioner's decision to the United States District Court, pursuant to 42 U.S.C. § 405(g). Based on the relevant pleadings and applicable law, the Court recommends the decision of the Commissioner be AFFIRMED.

B. **Factual History**[2]

   1. **Age, Education, and Work Experience**

Plaintiff was born on August 25, 1955, and was 53 years old at the time of the last ALJ decision. (Tr. at 36, 119, 1214). She has an eleventh grade education, and prior work experience as a cashier and lamp maker. (Tr. at 1215, 1250).

   2. **Medical Evidence**

The record indicates Plaintiff has a history of physical and mental problems. Plaintiff's physical problems include suffering from seizures, migraine headaches, bronchial asthma, and obesity. (Tr. at 225, 243, 259, 273, 286, 303, 360, 370-73, 427, 509, 625). In addition, Plaintiff suffers from problems with her upper extremities -- secondary to a cervical spine injury -- and weakness of the lower extremities secondary to a long period of physical inactivity due to her seizures. (Tr. at 427-28).

In August 1999, Plaintiff's treating physician, Dr. Mary Birdsong, reported Plaintiff had spasms in her neck and pain on palpation, but was neurologically normal. (Tr. at 357). In August 2000, Dr. Birdsong again noted spasms and pain, with no neurological deficit and normal gait and station. (Tr. at 337-39). However, in October 2000, Dr. Birdsong concluded Plaintiff's lumbar was getting worse. (Tr. at 482).

Plaintiff also suffers from pain in her back and neck and has been diagnosed with chronic pain disorder. (Tr. at 258, 378, 417). An MRI of Plaintiff's cervical spine was taken in 2001 and reflected a small posterior central protrusion of the disc material at C4-C5. (Tr. at 266). Another

---

[2] The current appeal and all facts recited concern only the time frame from June 1995, the alleged onset date, through August 2005, the time when the Appeals Counsel determined Plaintiff became disabled.

MRI administered in 2001, revealed degenerative disc disease at L4-L5 with mild bulge. (Tr. at 482).

In regard to Plaintiff's mental problems, the record reflects Plaintiff suffers from bipolar disorder, depression, and anxiety. (Tr. at 214, 408). The record also reflects that Plaintiff experienced panic attacks, which Plaintiff attributed to stress. (Tr. at 408, 397).

In 1999, Dr. Birdsong noted Plaintiff suffered from severe depression and panic disorder. (Tr. at 350). Dr. Birdsong also noted Plaintiff suffered from panic attacks, could not sleep, and was claustrophobic. (Tr. at 360). While Dr. Birdsong observed Plaintiff's affect was sad and she had anxiety, Dr. Birdsong also noted Plaintiff's judgment was unimpaired, she was oriented times three, and her recent and remote memory were intact. (Tr. at 350). In 2000, Dr. Birdsong remarked that Plaintiff demonstrated no anxiety and had an appropriate affect. (Tr. at 335, 339).

In 1999, Dr. Doyle Carson diagnosed Plaintiff with major depressive disorder, for which he prescribed Effexor. (Tr. at 529-30). Plaintiff did not return to Dr. Carson for over three years, at which time he diagnosed her with bipolar disorder. (Tr. at 527). A month later, in July 2003, Plaintiff informed Dr. Carson she was doing better with panic attacks, and Dr. Carson advised her to regularly take her medications. (Tr. at 525-26). The medical records also note multiple reports by Plaintiff of suicidal thoughts. (Tr. at 397, 417, 433, 999, 1023).

In 2001, Plaintiff saw Dr. Linda Ludden. (Tr. at 484-86). Dr. Ludden noted Plaintiff was relaxed after 12 minutes, and that after 45 minutes, Plaintiff's anxiety level was reduced on a scale from ten down to zero. (Tr. at 484). Dr. Ludden diagnosed Plaintiff with major depressive disorder (moderate and recurrent) and anxiety, and Dr. Ludden's notes indicate she also considered whether to rule out bipolar disorder. (Tr. at 486).

In 2002, Dr. David Kabel diagnosed Plaintiff with bipolar disorder and depression -- moderately severe to severe with chronic suicidal ideation. (Tr. at 417). And on several occasions in 2003, Plaintiff was examined by Dr. Scottie King, who consistently reported Plaintiff was alert, in no acute distress, oriented times four, and that her bipolar affective disorder was in remission. (Tr. at 505-516, 843, 855, 859, 863, 872, 878, 881, 886-87).

In 2003, Dr. Deborah Gleaves conducted a psychological evaluation and noted that Plaintiff had normal speech, was cooperative and easily engaged, made good eye contact and answered all questions; that Plaintiff's thought process was coherent and appropriate; and that Plaintiff showed no delusional thinking. (Tr. at 429-33). Dr. Gleaves also mentioned that Plaintiff reported feelings of worthlessness and hopelessness, disturbed appetite and sleep, suicidal ideation, and below average concentration, but concluded that Plaintiff had adequate judgment. (Tr. at 429-33). Dr. Gleaves determined that Plaintiff was anxious and depressed, and diagnosed Plaintiff with bipolar disorder II. (Tr. at 433-34). Dr. Gleaves assessed Plaintiff a Global Assessment of Functioning (GAF) score of 55, though Dr. Kabel assessed Plaintiff with a GAF score of 45-50, predominantly for her suicidal thoughts. (Tr. at 417, 433). Plaintiff's treatments included taking 7.5 mg hydrocodone tablets for neck and back pain, 4 mg of Xanax daily, 5 mg of Valium at bedtime, and Zoloft for her depression, and receiving trigger point and facet joint injections. (Tr. at 255-57, 261, 360, 370, 373, 516).

In July, 2002, Plaintiff received an internal medicine examination from Dr. Julius Wolfram. (Tr. at 424). At that time, Dr. Wolfram opined that Plaintiff "can sit only in a straight padded chair because of her problems with her spine . . . can stand and walk only briefly because of weakness secondary to a long period of inactivity necessitated by her seizures and by the brain

damage . . . and needs a cane for even very brief standing . . . and [an] electronic wheelchair so that she would not be confined to bed." (Tr. at 428).

Plaintiff's treating physician, Dr. Birdsong, on several occasions expressed opinions regarding Plaintiff's ability to work and whether Plaintiff was disabled. Specifically, Dr. Birdsong opined that "Plaintiff could not perform sedentary work," that Plaintiff "has been disabled at least from 1997 because of seizures, asthma, neck pain, and hearing loss" and that Plaintiff was disabled "when [Dr. Birdsong] first saw her." (Tr. at 631, 662). On December 8, 2003, Dr. Birdsong completed a Medical Assessment evaluation and concluded Plaintiff could rarely lift and carry five pounds and could never carry over five pounds. (Tr. at 633). In addition, Dr. Birdsong stated that Plaintiff could only perform certain activities -- such as sitting, standing or walking, handling, and reaching -- for non-specified, limited periods during an eight-hour workday. (Tr at 633-64). Dr. Birdsong also indicated that Plaintiff's ability to make occupational adjustments, performance adjustments, and personal/social adjustments was poor to none. (Tr. at 655-56).

### 3. Hearing Testimony

The ALJ held a hearing on March 11, 2009, where Plaintiff, a vocational expert, and two medical experts testified. (Tr. at 1211). Plaintiff was represented by counsel and testified that she was 53 years old and married. (Tr. at 1211-14). Plaintiff quit school three months before she was to graduate and never received her GED. (Tr. at 1215). At the time of the alleged onset date, Plaintiff was 39 years old and working as a cashier in a warehouse for a fast food chain. (Tr. at 1215). At that time, Plaintiff averred she "just fell apart" and "couldn't handle things anymore." (Tr. at 1216). When asked what caused her stress, Plaintiff answered that she broke

her neck in 1990. (Tr. at 1216). Plaintiff testified that, in 1995, she was having trouble with depression and ambulation, but was able to walk without assistance until she fell and hurt her back in 2000. (Tr. at 1217). In 1999, Plaintiff's infant grandson died in her bed. (Tr. at 1218) Plaintiff also testified that in 2000, she fell out of her husband's truck and "messed up [her] lower vertebras." (*Id.*)

Plaintiff testified further that between 1995 and 2005, she suffered seizures three to four times a week, beginning after she broke her neck. (Tr. at 1219). During the same time period, Plaintiff attempted suicide and was seen by several different psychiatrists. (Tr. at 1219). In and around 1999, a normal day for Plaintiff included sitting on the couch with her curtains closed and lying in bed. (Tr. at 1224-25).

Dr. Sterling Moore, a medical expert, testified that studies regarding Plaintiff's alleged seizure disorder from 1995 though 2005 were essentially normal, noting Plaintiff's seizures were non-epileptic, and opining that "it was questionable whether she had . . . true seizures." (Tr. at 1227). In addition to Plaintiff's seizures, Dr. Moore stated Plaintiff experienced pulmonary problems that were exacerbated by her asthma, but which never approached the listing level. (Tr. at 1227, 1229).

Dr. Moore noted that Plaintiff experienced pain in her neck, and doctors persistently noted abnormal findings that dated back to her neck fusion in 1990. (Tr. at 1228). According to Moore, the findings indicate upper motor neural damage, and examinations have shown decreased range of motion in her back and neck, dysphagia or abnormal sensation in the forearms and hands, early degenerative changes, and weakness in the lower extremities. (Tr. at 1228). Dr. Moore also stated Plaintiff had been diagnosed with myofascial pain syndrome, but

concluded that some of Plaintiff's complaints of pain were not proportionate to the objective evidence. (Tr. at 1229, 1234).

Dr. Moore also noted that Plaintiff has received injections and, in 1990, had surgery for her neck and back pain. (Tr. at 1229). He opined that, while Plaintiff had taken seizure and pain medications which could cause side effects, he would not expect them to do so. (Tr. at 1230-31). Dr. Moore further testified Plaintiff has level-two obesity that compounded her back and breathing problems. (Tr. at 1229).

Based on his review of the record, Dr. Moore opined that (before August 24, 2005) Plaintiff's impairments did not, individually or in combination, meet or medically equal the requirements of a Listing, and that Plaintiff could lift 10-20 pounds, stand or walk for four hours out of an eight-hour day, sit for six hours out of an eight-hour day, and that Plaintiff should avoid ropes, ladders, scaffolds, and pulmonary irritants. (Tr. at 1229-30). He further testified that Plaintiff's Residual Functioning Capacity ("RFC") should be limited by the usual seizure precautions, including not being around machines or exposed to heights. (Tr. at 1231). Dr. Moore further opined Plaintiff's pain, seizures, and pulmonary flares could cause her to miss work, but that based on the record, he could not say how much. (Tr. at 1231).

Dr. Smith testified next regarding Plaintiff's mental impairments. (Tr. at 1235). Dr. Smith opined that Plaintiff has suffered from anxiety and depression, secondary to some of the physical problems. (Tr. at 1235). Dr. Smith averred that the record does not reflect significant mental problems until November of 1999, and that Plaintiff seemed to respond to medication. (Tr. at 1236). Dr. Smith opined that around 2001, significant mental issues began arising with Plaintiff. (Tr. at 1238). Dr. Smith assessed Plaintiff's performance of daily living activities, her

social functioning, and her ability to perform concentration, persistence, and pace activities, during that period, as moderate. (Tr. at 1238) He also stated that he did not notice any episodes of decomposition. (*Id.*).

Dr. Smith opined that Plaintiff's limitations would not have met or equaled a listed mental impairment during the relevant time period, nonetheless, Plaintiff's work should be limited to simple repetitive tasks and non-public contact. (Tr. at 1239). During his testimony, Dr. Smith noted that the medical record he relied on was incomplete due to missing pages. (Tr. at 1244-45). However, after reviewing the missing pages, Dr. Smith testified that his position regarding Plaintiff's mental impairments remained unchanged. (*Id.*)

The final witness was Jerold Hildre, the vocational expert. (Tr. at 1250). Mr. Hildre first summarized Plaintiff's past jobs as a lamp maker and a fast food cashier as involving only light work. (Tr. at 1250). When presented with the ALJ's RFC finding, as detailed below, Mr. Hildre stated Plaintiff would not be able to perform her past work. (Tr. at 1251). However, Mr. Hildre opined Plaintiff would be able to perform work as an optical goods assembler or lens inserter. (Tr. at 1251-52). Both jobs are classified as sedentary and unskilled. (Tr. at 1251-52). Though, according to Hildre, if Plaintiff's capacity fell below a sedentary level, or if she missed more than one day of work a month, she would not be competitive in those jobs. (Tr. at 1252-54).

**C.     ALJ's Findings**

The ALJ found Plaintiff met the insured status requirements of the act through June 30, 1999, and that she had not engaged in substantial gainful activity between June 26, 1995 and August 23, 2005. (Tr. at 22-23). He found that Plaintiff had the severe impairments of seizure disorder, pulmonary problems, neck and back pain with cervical fusion in 1990, trigger point

injections, lower extremity weakness, obesity with a BMI of 38, depression, and anxiety. (Tr. at 23). The ALJ concluded that, during the relevant time period, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404. (Tr. at 26).

The ALJ further determined Plaintiff had the RFC to generally perform light work as defined in 20 C.F.R. § 404.1567(b), in that Plaintiff could stand or walk for no more than two to four hours in an eight-hour workday, and she could sit for six hours in an eight-hour workday. (Tr. at 27). The ALJ found that Plaintiff should avoid scaffolds, ropes, ladders, climbing, stooping/bending, wetness/humidity, fumes or odors, hazards or machines, open flames, driving, and heights. (Tr. at 27). Additionally, the ALJ found Plaintiff to be limited by depression and anxiety to only understanding, carrying out, and remembering short and simple tasks and instructions. (Tr. at 27). The ALJ concluded that, although Plaintiff was not able to perform her past relevant work, she was not disabled as defined by the Act before August 24, 2005, because then she could perform other jobs that existed in significant numbers in the national economy. (Tr. at 34-35).

## II. ANALYSIS

A. **<u>Legal Standards</u>**

    1. **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more

than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not re-weigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or no contrary medical findings. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

    **2.    Disability Determination**

The definition of disability under the Social Security Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

> 5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

B. <u>**Issues for Review**</u>

*(1) Did the ALJ afford the medical evidence the proper weight?*

Plaintiff avers the ALJ erred in rejecting the opinions of certain physicians. In support of her claim, Plaintiff first argues the ALJ erred by not giving the opinion of Plaintiff's treating physician, Dr. Mary Birdsong, controlling weight. (Doc. 19-1 at 15-17). For the reasons that follow, the Court is not persuaded by this argument.

Although not conclusive, an evaluation by the claimant's treating physician should be accorded great weight. *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir. 1995). A treating physician's opinion on the nature and severity of a patient's impairment must be given

controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Id*. (citing 20 C.F.R. § 404.1527(d)(2)). Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. *Martinez*, 64 F.3d at 76 (citation omitted). The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion. *Id*. (citation omitted). A treating physician's opinion also may be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 455-56 (5th Cir. 2000).

Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id*. at 453 (emphasis in original). Those criteria include: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician. *Id*. at 455; *see also* 20 C.F.R. § 416.927(d)(2) (governing SSI). When an ALJ fails to consider all evidence from a treating source and fails to present good cause for rejecting it, the matter should be remanded for further consideration. *Newton*, 209 F.3d at 457.

In this case, the ALJ correctly concluded that Dr. Birdsong's statements that Plaintiff was

disabled and not able to work went beyond medical opinions, and instead were legal conclusions on issues reserved to the Commissioner. (Tr. 33); *Martinez*, 64 F.3d at 76. Moreover, the ALJ's conclusion that Dr. Birdsong's functional assessment of December 8, 2003, was not supported by medically acceptable clinical and laboratory techniques is consistent with the record. (Tr. at 33). *See Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) (noting good cause exists to disregard a treating physician's medical opinion if it is brief and conclusory, not supported by medically acceptable clinical laboratory techniques, or otherwise unsupported by the evidence).

As the ALJ noted, Dr. Birdsong concluded, without medical evidence, that Plaintiff had a spinal injury compromising the nerve root and that Plaintiff could not complete a normal work day or work week without Plaintiff exhibiting psychological symptoms or exhibiting behavioral extremes. (Tr. at 25, 640). As the ALJ also pointed out, the latter conclusion is inconsistent with Dr. Birdsong's own notes indicating Plaintiff's judgment was unimpaired and that Plaintiff did not show problems with memory, mood changes, or behavior. (Tr. at 33). Additionally, while Dr. Birdsong stated Plaintiff had chronic asthmatic bronchitis and required long rest breaks during the day, there were no studies to support this finding, nor were there treatment note entries to support such limitations. (Tr. at 33; 639).

The ALJ also pointed to other medical assessments and testimony which contradicted Dr. Birdsong's findings. Specifically, the ALJ noted Dr. Gleaves found no evidence of Plaintiff's impaired judgment or below average concentration. (Tr. at 33). In addition, the ALJ stated that after reviewing the record, Dr. Smith opined that Plaintiff should only be limited to simple work, while Dr. Moore testified the claimant had no profound physical findings. (Tr. at 32-33).

The record bears out the ALJ's conclusion that Dr. Birdsong's opinions lacked sufficient

supporting evidence. Therefore, the Court finds Plaintiff's argument that the ALJ erroneously rejected Dr. Birdsong's opinion to be without merit.

Plaintiff claims the ALJ also improperly discounted the opinions of Dr. Wolfram. (Doc. 19-1 at 20). However, just as with Dr. Birdsong, the opinions of Dr. Wolfram, a consultive examiner, were not based on medical findings and were contradicted by other medical opinions and testimony. (Tr. at 25, 30, 33). The ALJ specifically stated that Dr. Wolfram's assessment "appear[s] to merely follow from Plaintiff's subjective complaints," and noted that there were no CT scans in the record to support Dr. Wolfram's assertion that Plaintiff suffers from brain damage. (Tr. at 33). Accordingly, the Court concludes that the ALJ did not err in his consideration of Dr. Wolfram's opinions.

Plaintiff's argument that Dr. Smith's testimony was based on an incomplete file is a non-starter. (Doc 19-1 at 17). As the ALJ correctly pointed out, after reviewing the missing pages of the record, Dr. Smith testified that his opinions had not changed. (Tr. at 31, 1244-45).

Plaintiff also argues the ALJ erred in finding: 1) that Plaintiff's GAF scores were determined during "high stress periods;" 2) that "the evidence shows a general improvement with psychiatrist-mediated medication;" 3) that Dr. Carson did not tell Plaintiff to suspend taking her medication; and 4) that it was "reasonable to conclude that the weight issue would help support reducing the functional capacity to sedentary." (Doc. 19-1 at 17-19, 21). However, the record supports the ALJ's factual findings, specifically that Plaintiff's GAF scores were taken during high stress periods and her condition improved with medication, leading Dr. Carson to advise Plaintiff to keep steady on her medications (Tr. at 395, 417, 525, 660-663). Moreover, the ALJ properly considered Plaintiff's obesity, finding Plaintiff had a weight problem with a BMI of 38

and considering Plaintiff's obesity in reducing the RFC from light-medium level to sedentary, while also noting its possible impact on her other impairments (Tr. at 33-34). Thus, the Court finds these arguments are also without merit.

*(2) Did the ALJ erred in accepting the jobs suggested by the Vocational Specialist?*

Plaintiff contends the ALJ erred by accepting types of available and appropriate jobs proposed by the vocational specialist that require working with hazardous tools, contrary to the ALJ's RFC determination. (Doc. 19-1 at 22-23). According to the Dictionary of Occupational Titles, however, neither job proposed by the vocational specialist requires use of hazardous machines. *See* Dictionary of Occupational Titles, Volume II, code 713.684.018, .024 at 709 (rev. 4th ed. 1991). Accordingly, the Court finds this argument lacks foundation.

*(3) Did the ALJ fail to consider the side effects of Plaintiff's medications?*

Plaintiff next avers the ALJ failed to properly consider the side effects of Plaintiff's medications. (Doc. 19-1 at 23). The Court cannot find, nor has Plaintiff pointed to, any evidence in the record that Plaintiff actually suffered any side effects from her medication. In fact, while Dr. Moore testified that Plaintiff's medications could cause side effects, he further stated that he would not expect Plaintiff's medications to do so. (Tr. at 1231). Plaintiff's argument lacks merit.

*(4) Did the ALJ properly consider Plaintiff's allegations of pain?*

Plaintiff next contends the ALJ failed to properly consider Plaintiff's allegations of pain and failed to adequately discuss the duration, frequency, and intensity of Plaintiff's pain. (Doc. 19-1 at 23-24).

SSR 96-3p requires that "the intensity, persistence, and limiting effects of the symptom(s)

must be considered along with the objective medical and other evidence in determining whether the impairment or combination of impairments is severe." In addition, SSR 96-7 provides that a description the kinds of evidence that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements, including the "location, duration, frequency, and intensity of the individual's pain or other symptoms," can be found at 20 CFR 404.1529(c) and 416.929(c).

Here, although the ALJ found Plaintiff's complaints of pain to be sincere, the ALJ found those complaints to be "outside the range of reasonable attribution according to the medical opinions of record." (Tr. at 28). In making this determination, the ALJ considered the record as a whole, including Plaintiff's subjective complaints of pain, the medical evidence, and the opinion of physicians and experts. (Tr. at 23-34). The ALJ implicitly credited Dr. Moore's opinion that Plaintiff's reported pain was inconsistent with the record. (Tr. at 30). Accordingly, as the ALJ's conclusion is supported by substantial evidence, the Court finds this argument to be without merit.

*(5) Did the ALJ fail to consider the combined impact of Plaintiff's impairments?*

Plaintiff argues the ALJ failed to consider the impact of her impairments in combination. (Doc. 19-1 at 24). Specifically, Plaintiff contends the ALJ failed to consider Plaintiff's obesity in combination with her other impairments, and failed to consider her physical and mental impairments in combination. (Doc. 19-1 at 24). In making a disability determination, "the ALJ must analyze both the 'disabling effect of each of the claimant's ailments' and the 'combined effect of all of these impairments.'" *Loza v. Apfel*, 219 F.3d 378, 399 (5th Cir. 2000).

Here, a review of the ALJ's decision reveals that he was aware of, and applied, the

appropriate cumulative impact standard. (Tr. at 22, 26-28, 33-34). Specifically, the ALJ stated that he "must consider all of the claimant's impairments, including impairments that are not severe." (Tr. at 22). The ALJ also noted Plaintiff "did not have an impairment or *combination* of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 during the period of adjudication." (Tr. at 26) (emphasis added). Moreover, the ALJ's decision thoroughly summarizes all Plaintiff's impairments, the medical evidence, and the expert opinions and testimony. (Tr. at 23-35). And, the ALJ acknowledged that the combined effects of Plaintiff's obesity with her other impairments may be greater than what would be expected without obesity, and noted that he had, in fact, considered the effects of Plaintiff's obesity and included those effects in Plaintiff's RFC. (Tr. at 33-34). Thus, Court finds the ALJ properly considered Plaintiff's impairments in combination with one another, and Plaintiff's argument fails.

*(6) Did the ALJ sufficiently discuss the evidence to satisfy SSR 96-7p?*

Finally, Plaintiff avers the ALJ's recitation of the requirements of 20 C.F.R. sections 404.1529 and 416.929 are insufficient to satisfy the requirements of SSR 96-7. (Doc 19-1 at 25). SSR 96-7 requires the ALJ to give specific findings on his credibility determinations. As stated previously herein, the ALJ specifically discussed his decision to credit some, but not all, of the evidence. Some examples include the ALJ's finding that although Plaintiff's subjective complaints of pain were sincere, they were inconsistent with other evidence in the record, including the testimony of a medical expert. Moreover, the ALJ was thorough in his recitation of the basis for his rejection of some opinion evidence, including that of Dr. Birdsong and Dr. Wolfram. The Court concludes, therefore, that Plaintiff's argument lacks support.

## III. RECOMMENDATION

For the foregoing reasons, the undersigned recommends that Defendant's *Motion for Summary Judgment* (Doc. 20) be **GRANTED**, Plaintiff's *Motion for Summary Judgment* (Doc. 19) be **DENIED**, and the Commissioner's decision be **AFFIRMED**.

**SO RECOMMENDED** on May 24, 2011.

RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE